# UNITED STATES DISTRICT COURT

for the
Western District of Arkansas
Fort Smith Division

| | |
|---|---|
| In the Matter of the Search of<br>Residence, Outbuildings and Vehicles located at<br>6100 Persimmon Hill Road<br>Booneville, Arkansas 72927 | Case No. 2:19 Cm 14<br><br>**Filed Under Seal** |

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

APR 2 5 2019

DOUGLAS F. YOUNG, Clerk
By _____
Deputy Clerk

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe property to be searched and give its location)*: **Residence, Outbuildings and Vehicles located at 6100 Persimmon Hill Road, Booneville, Arkansas, 72927, more particularly described on "Attachment A".**

located in the Western District of Arkansas, there is now concealed *(identify the person or describe the property to be seized)*: **More particularly described on Attachment "B".**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

X   evidence of a crime;

X   contraband, fruits of crime, or other items illegally possessed;

X   property designed for use, intended for use, or used in committing a crime;

☐   a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 16 U.S.C. §§ 470ee(a) | Unlawful excavation, removal, damage to, altering or defacing archaeological resources located on public or Indian lands without authority to do so |

The application is based on these facts:

X   Continued on the attached sheet.

☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Mia T. Prince, Special Agent, U.S. Forest Service

Sworn to before me and signed in my presence.

Date: 4/25/19

*Judge's signature*

City and state:   Fort Smith, Arkansas

Mark E. Ford, United States Magistrate Judge

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Mia T. Prince, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.      My name is Mia T. Prince. I have been employed by the United States
Department of Agriculture ("USDA") Forest Service, Law Enforcement and Investigations, since
July 2001. I am a Special Agent, Criminal Investigator, assigned to the Ouachita National Forest
which is within the Western District of Arkansas, Hot Springs Division. I have worked as a
Special Agent, Criminal Investigator, for the past seven years. I graduated from the Criminal
Investigator Training Program at the Federal Law Enforcement Training Center in Georgia. I
previously served for ten years as a certified uniformed Law Enforcement Officer for the Forest
Service, having graduated from the Land Management Training Program at the Federal Law
Enforcement Training Center in Georgia. In addition to primarily conducting investigations and
enforcement activities under Federal authority, I conduct investigations under State of Arkansas
authority granted pursuant to Arkansas Code Annotated 16-81-106 (g)(14). I have received
certification in Archaeological Resources Protection Training through the Federal Law
Enforcement Training Center. I have previously worked in the Southwest United States, an area
that is rich in archaeological resources. I have conducted and assisted with investigations
pursuant to the Archaeological Resource Protection Act ("ARPA"), found in Title 16, United
States Code, Sections 470ee(a) and Title 36 of the Code of Federal Regulations, Part 261, to
include field assessments, surveillance, and previous search warrant executions particular to
ARPA violations and investigations.

2.      Title 16, United States Code, Section 470ee(a), makes it is a crime to excavate, remove, damage, or otherwise alter or deface, or attempt to excavate, remove, damage, or otherwise alter or deface any archaeological resource located on public lands or Indian lands unless such activity is authorized pursuant to a permit issued under Section 470cc(g)(1) of Title 16. The penalty provision in Title 16, Section 470ee(d) provides that any person who knowingly violates or counsels, procures or solicits, or employs any other person to violate any prohibition contained in subsection (a) . . . of this section shall, upon conviction, be fined not more than $10,000 or imprisoned not more than one year, or both: *Provided, however,* that if the commercial or archaeological value of the archaeological resources involved and the cost of restoration and repair of such resources exceeds the sum of $500, such person shall be fined not more than $20,000 or imprisoned not more than two years, or both. . . . (italics in original).

3.      Your Affiant is aware that no permit nor authority have been given to excavate, remove, damage, or otherwise alter or deface, or attempt to excavate, remove, damage or otherwise alter or deface the Hicks Archeological Site in the Ouachita National Forest within the Western District of Arkansas.

4.      The following information in this Affidavit is based upon my personal knowledge and observations, those of fellow federal law enforcement officers, and a Forest Service Archaeologist. The information in this Affidavit is provided for the limited purpose of establishing probable cause and does not constitute a complete statement of all the facts related to this case that are known by your Affiant.

5.      Based upon my training, experience, and participation in investigating archaeological resource crimes and other violations, as well as the knowledge I have received from other law enforcement officers with whom I have worked, I know the following to be true:

2

a.      A cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other cellular telephones or traditional "land line" telephones. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the telephone. In addition to enabling voice communications, cellular telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      That it is common for looters to offer for sale to other parties archeological resources illegally taken from Archeological sites. Looters often utilize electronic equipment, such as cellular telephones, to contact prospective purchasers of looted archeological resources. Cellular telephones also store data which may indicate  numbers of calls placed, numbers of calls received, time of calls, and information pertaining to the location of the cellular telephones.

c.       Looters also are known to post photographs with their looted resources on Facebook and other internet sites to show what they have obtained and also to obtain purchasers of the items looted. Cellular telephones are often used to transmit these postings.

d.      Looters often take or cause to be taken photographs and videos of themselves, their associates, their assets and their products. That looters usually maintain these photographs

3

and videos in their possession, often on cellular telephones, in locations over which they maintain dominion and control;

     e.    Looters often travel in furtherance of their illegal activities, including traveling to transport artifacts for sale and/or trade. Cellular telephones typically leave records of these communications.

     f.    Based on my knowledge, training, and experience, I know that electronic devices, such as cellular telephones, can and often do store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

## PROBABLE CAUSE

     6.    On April 30, 2018, a United States Forest Service (USFS) District Employee found approximately 15 holes dug at the Hicks Archeological Site (3SC0132) located off Forest Service Road (FSR) P94D in the Ouachita National Forest, within the Western District of Arkansas. The Hicks Archeological Site was home to North American ancient tribes who used it as a workshop site to craft arrowheads and other stone tools. Archaeologists estimate the site was occupied around 3000 B.C. (Late Middle Archaic Period) making it a host to ancient artifacts and possible human remains/burial items. Based upon your Affiant's research and training, your Affiant knows that this area is designated as concurrent federal and state jurisdiction.

     7.    On April 30, 2018, USFS Law Enforcement Officer (LEO) Paul Jolivette ("Jolivette") was informed of the incident by the USFS District Employee. Jolivette, in turn, informed your Affiant of the suspected illegal activity.

8.      On May 30, 2018, USFS Archeological Technician Marilyn Huddleston informed Jolivette that there was evidence of fresh digging in the Hicks Archaeological Site. Huddleston advised Jolivette that she found two freshly dug holes that she photographed for documentation.

9.      On June 14, 2018, Jolivette and Joe Liles ("Liles"), who is also a certified federal law enforcement officer in the Ouachita National Forest, assisted district personnel consisting of the District Ranger, Forest Archeologist, and three Archeology technicians with the USFS to conduct damage assessment for the Hicks Archaeological Site. Upon thorough assessment of the site, it was unanimously determined that the bulk of the disturbances were caused by wild hogs. A couple of digs, however, were attributed to human activity as evidenced by discarded artifact pieces.

10.     On September 21, 2018, Huddleston advised Jolivette and your Affiant that she had visited the Hicks Archaeological Site and observed new disturbances near Hole #8, 11, 12, and by the fire ring. Huddleston also observed a purple flannel Crown Royal liquor bag that was new to the area. Technical Investigative Equipment (TIE) was deployed in the area to collect video evidence of illegal digging activities and to identify suspects in the case.

11.     On October 3, 2018, your Affiant, Liles, Jolivette, and Huddleston hiked into the Hicks Archaeological Site where evidence of fresh illegal human digging activity was observed, such as a hole near the fire ring. Located next to the fire ring was a purple Crown Royal bag that Huddleston had observed on September 21, 2018. An inventory of the Crown Royal bag was conducted. Approximately 76 worked rocks and point fragments/partial artifact pieces were located inside the bag. The purple Crown Royal bag was not collected so that the suspects would not know that officers were aware of their activity. The unique stitching on the Crown Royal bag was noted and photographed for later identification purposes if needed.

5

12.     On October 30, 2018, Liles and Jolivette returned to the Hicks Archaeological Site to service the TIE deployed in the area. They immediately noticed signs of new illegal human activity when they entered the area. There was more digging in the hole located by the fire ring and the purple Crown Royal bag was gone. Officers observed three new holes believed to be test holes where it appeared the suspect(s) shallowly dug the surface area. No evidence was collected from the TIE because the battery on the system died before the suspect(s) entered the area.

13.     On December 17, 2018, Liles and Jolivette serviced the TIE on the Hicks Archaeological Site. Upon arrival at the location, evidence of fresh human foot traffic was readily apparent that showed foot traffic going into the area where the illegal digging activity was occurring and TIE was located. Officers observed partial shoe impressions throughout the site and near some of the new holes. The shoe impressions appeared to be from three different pairs of hiking boots. At the deployed system's location, fresh digging holes were observed in front of and around the immediate area. Several digging holes were visible. A cardboard food box that had been left in an abandoned fire ring was observed. Upon review of the recording and photographs collected from the TIE, three individuals could be seen digging in the archeological site using hand tools and light sources while carrying white burlap sacks. Due primarily to the time of night and the resolution of the camera, an identification of the suspects could not be achieved from the recordings.

14.     On December 18, 2018, USFS Archeologist Roger Coleman provided your Affiant with an initial damage assessment report for damage to the site. The assessment documented illegal human activity in the site and estimated the damage to be in the amount of

$11,485.27. Since that time, additional damage has been done at the site, so your Affiant knows that an updated damage assessment report would reflect an amount greater than $11,485.27.

15.     On March 8, 2019, Liles and Jolivette went into the Hicks Archaeological Site to reinstall TIE in the area. Upon entering the site, officers immediately noticed fresh evidence of human traffic going into the area on a well-defined trail. Officers also observed fresh looter holes on the trail leading into the site. Upon arriving at the archeological site where the previous illegal digging occurred, officers observed numerous fresh dug holes located all throughout the area. The holes varied in size and depth. It was also noted that there was another fire ring. Officers also observed a Dr. Pepper can near one of the recently dug holes. Liles and Jolivette installed one unmanned surveillance system and informed your Affiant of the new extensive damage caused by illegal digging activity at the site.

16.     On March 15, 2019, officers returned to the site to service the TIE deployed. As officers reached the site, they immediately observed new digging activity in the area. Your Affiant observed a circular area that contained approximately six new looter holes to the right/eastern edge of the site. Shoe impressions were located throughout the area that appeared to belong to a hiking boot. A Busch beer can was located near a small hole along with a shoe impression. Your Affiant located a Marlboro cigarette butt near one of the new holes that was collected as evidence. Up the trail slightly to the left/western edge of the site, another dig area was located with approximately eight holes. One of the small holes had a shoe impression. Your Affiant noted a new freshly dug hole at the entrance of the site and saw a shoe impression near the hole. The shoe appeared to be a hiking boot that was larger in size than the other boot print. Further into the site on the eastern edge of the site were approximately nine new holes and partial shoe impressions. Your Affiant observed new digging near a new fire ring with approximately

7

six larger holes. One shoe impression was discovered in the area. Near the original fire ring, six new holes were discovered. Your Affiant also located a clear plastic container with a purple cap that contained a Batman sticker near the ring. Another Dr. Pepper can was observed that appeared to be different than the Dr. Pepper can observed by the officers' last visit to the site. Approximately 25 feet north from the original fire ring an area contained approximately twelve holes throughout the area. A partial shoe impression was observed in the area and your Affiant located ash from a cigarette and a Marlboro cigarette butt located near one of the small holes which was collected as evidence. A black glove was discovered near a new digging hole north of the original fire ring. Another large hole located southeast of the main site at the base of a tree was also discovered. Officers discovered sunflower seed shells scattered throughout the site which were collected as evidence. A looter pile of discarded artifacts (partial artifact pieces) was also located at the edge of the hole.

17.     On March 15, 2019, the video recordings and photographs collected from the TIE documented that on March 10, 2019 at approximately 1204 through 0129 hours, two individuals were observed in the site walking around with flashlights. One of the individuals appeared to be a larger framed individual wearing a ball cap, jacket, and jeans (hereinafter "S1"). Video shows S1 carrying an object in his right hand that appeared to be a bucket. Another individual (hereinafter "S2") is observed by a tree and holding a long tool that S2 is using to comb the ground; however, S2's build and clothing were not visible. S1 and S2 can be observed picking up items and placing them into the buckets while in the site. On March 12, 2019 at approximately 1301 hours, a white male (hereinafter "S3") wearing glasses, a camouflage ball cap, a light colored button up shirt, blue jeans, and hiking boots is observed walking in the site looking at the holes. On March 13, 2019 at approximately 1701 hours, a white male wearing an orange and

8

grey ball cap, tan jacket, blue jeans with dirty/muddy knees, and hiking boots (hereinafter "S4") is observed carrying a small red shovel in his right hand looking at the hole in the site. On March 13, 2019 at approximately 1711 hours, S4 along with another white male larger in size and who appears to be S1 wearing a white/striped button-up shirt, blue jeans, boots, and a cap is observed carrying a black car floor mat. On March 13, 2019 at approximately 1714 hours, both S1 and S4 are seen in the area and one of the males appears to have a firearm in a holster on his right hip and a shovel in his left hand. The other male is observed with a shovel in his left hand. Based on the recordings and photographs collected from the system, it appears S1, who was seen at the site during the early morning of March 10, 2019, is the same individual observed in the site on March 13, 2019. This conclusion is based on the individual's similarity in size, profile, clothing, and activity he was conducting within the site.

18.     On April 2, 2019, your Affiant, Liles, Jolivette, and certified federal law enforcement officer David Cadle returned to the Hicks Archaeological Site to service the TIE deployed. Immediately walking on the trail into the site, officers observed three different shoe impressions in the dirt on the trail. As officers made their way into the site, on the most southern edge of the trail, new digging activity was observed. There were two new large holes and another hole near the base of a tree in the area. A Best Choice brand water bottle was also located near a new hole located on the southwestern edge of the site. On the northwestern edge of the site, another looter hole was discovered with a Best Choice brand empty water bottle located next to it. Also found were pieces of partial artifacts discarded in and around the hole. On the eastern edge of the site, approximately four new dig sites were located near the base of trees located in the area. Two of the holes were larger in size and at one of the holes, a Coke can and partial pieces of artifacts (one white in color) that appeared to be discarded by looters were discovered.

The northern edge of the site had numerous large holes that appeared to be recently dug. Two holes were observed north of the original fire ring in which one of the holes was significant in width, length, and depth. Your Affiant located a shoe impression and a third looter hole near the northeastern edge of the original fire ring which also was significant in width, length, and depth. Near and around the original fire ring, your Affiant observed approximately five new small holes.

19.     On April 2, 2019, your Affiant reviewed the recording/photographs collected from the TIE deployed. The recording/photographs revealed that on March 15, 2019 at approximately 2004 hours, an individual who appears to be S1 is observed in the site using a light source while digging at the base of a tree located at the southern edge of the site. Another individual who appears to be S2 is observed using a light source and digging in the site near the original campfire ring. Videos show the individuals continue to actively dig in the southern edge of the site. It also appears that S3 is walking toward the other two suspects using a light source. Due primarily to the time of night and the resolution of the camera, an identification of the suspects could not be positively achieved from the recordings.

20.     On March 16, 2019 at approximately 1311 hours, a white female (hereinafter "F1") with brown hair wearing a tan/forest green ball cap, dark colored tee-shirt, jeans, and boots is observed holding a white bucket walking through the site with a tool in her right hand. Another white female (hereinafter "F2") with short blonde hair wearing a bandanna, a blue and black striped hoodie, blue jeans, and boots was observed smoking a cigarette and holding a white bucket with a red lid. F2 was also observed picking up objects in the dig site and putting them in the bucket. F2 looks directly at the unit and a clear image of her face was captured.

10

21.     On March 19, 2019 at approximately 1458 hours, a white male (hereinafter "M1")
with brown hair wearing a ball cap, long sleeve camouflage shirt, blue jeans, and hiking boots
was observed carrying a white bucket in his right hand and a water bottle in his left hand. M1 is
observed putting a water bottle down on the ground and begins digging with a tool in the
southwest edge of the site. *Note: Your Affiant identified this hole and water bottle to be the
same one located during the TIE service on April 2, 2019.* A small child (hereinafter "C1") with
blonde hair wearing an orange hoodie (with a black emblem and writing on the front), blue jeans,
and black tennis shoes was observed walking through the site. C1 was holding a bucket in his left
hand and a crowbar in his right hand walking to the northern edge of the site. Another small
child (hereinafter "C2") with dark hair and wearing an olive green long sleeve top and blue jeans
is observed in the site. A bald white male (hereinafter "M2") with a mustache that tapers at the
ends and droops to the chin is observed talking on a cell phone in the site. M2 was wearing blue
jeans, a belt, boots, and a silver necklace. M2 is observed carrying a blue canvas bag containing
various digging tools and a small pitch fork.

22.     On March 22, 2019 at approximately 1816 hours, three males and two children
were observed in the site. One of the males appeared to be M1 and the children appeared to be
C1 and C2, all of whom were observed in the site on March 19, 2019. M1 was observed wearing
a tan ball cap, blue tee-shirt, and blue jeans. Another white male (hereinafter "M3") wearing a
ball cap, blue tee-shirt, and jeans and the third male (hereinafter "M4") wearing an orange and
tan ball cap, white tee-shirt, blue jeans, and boots was observed in the site. M4 also had a black
soft brace on his left arm. C1 was observed wearing a white tee-shirt, jeans, and black tennis
shoes and C2 had an orange tee-shirt with black writing and logo on the front, blue jeans, and
orange and brown cowboy boots. M1 and M3 were observed sitting on the ground actively

11

digging in separate holes. *Note: Your Affiant identified the two holes to be the same ones observed and documented in the site located at the most southern edge of the site.* M4 stood near M1 and M3, holding what appeared to be a small cooler and a tool in M4's right hand. C1 was observed holding a basket in his right hand and collecting objects out of one of the holes. C2 also had a basket in his right hand and a small shovel in his left hand. A red container was located on the ground near M1's hole. The group continue to dig in the site using crowbars, hammers, and other tools. M1 and M3 continued to dig in the holes located at the southern edge of the site. M2, identified as the same male observed in the area on March 19, 2019, is seen shirtless and wearing blue jeans, black sunglasses on his forehead, and boots. A tattoo is observed on M2's right shoulder and forearm. Video shows that M2 walks up to M1's and M3's location carrying a long object, possibly a tool or firearm, that he throws down on the ground along with a long sleeved camouflage shirt. M2 shows M1 and M3 an object that he has in his left hand.

23.    On March 24, 2019 at approximately 1531 hours, two females are observed in the site. One of the females appears to be F1 who was observed in the site on March 16, 2019. F1 is wearing a forest green with tan bill ball cap with two distinct lines on the left side of the cap. She also is wearing blue jeans with what appears to be a wrangler logo on the back right pocket. She had a purple shirt with a lot of color on the front. Another white female, (hereinafter "F3"), with blonde/red hair in a bun at the top of her head is wearing a green tie-dyed tank top, blue jeans, black slide shoes with a red Nike logo on the top, necklace, and bracelets on her right wrist. F3 is observed smoking a cigarette and has a tool in her left hand. F3 shows F1 an object that looks like an artifact that she gives to her. F1 then shows F3 an artifact she has in her right hand. On March 24, 2019 at approximately 1331 hours, F3 stands directly in front of the system digging in the site with a tool. A clear view of F3's face was captured by the system.

12

24.     On April 2, 2019, your Affiant reviewed the recording and photographs collected from the TIE installed on the trail and on March 22, 2019. At approximately 1849 hours, two males, one identified to be M1, were observed walking and stopped to talk to each other on the trail. A clear view of M1's face and side profile was captured by the system. M1 has a mustache and dark curly hair. The view of the other individual was partially blocked however based on his clothing it appears the individual is M3. M3 is observed handing M1 an object which appears to be a piece of paper or money that M1 takes. C2 is observed holding a basket and is accompanying the two men on the trail. M1, C2, and others are observed digging in the site on March 22, 2019 from 1709 through 1839 hours, according to the system deployed inside the archeological site.

25.     On April 2, 2019, Liles informed your Affiant that he had information identifying F1 to be Rachel (last name unknown). LEO Liles stated F1 is a local resident in the area of where the archaeological site is located and is known to work at a local chicken house in the vicinity of the site.

26.     On April 10, 2019, Jolivette met with Scott County Sheriff's Office Chief Deputy Billy Carnahan, who used to be the jail administrator at the Scott County Detention Center. Jolivette showed him the videos and photographs collected of the suspects. Due to working at the detention facility and booking three of the individuals into jail on prior charges, Carnahan was able to make the following identifications: F2 was D. W. with a date of birth in 1973 and social security number xxx-xx-x117; F3 was J. B. with a date of birth in 1986 and social security number xxx-xx-4216; and M2 was GARY JUSTICE with a date of birth in 1974 and social security number xxx-xx-8257.

13

27.     On April 16, 2019, your Affiant, Liles, Jolivette, and Cadle returned to the site to service the TIE installed on the trail, in the site, and on the road leading into the site. As officers arrived in the site, it was immediately apparent there was new illegal digging activity in the site location. Most of the new activity occurred at the northwestern edge of the site. Your Affiant observed approximately eleven new holes scattered throughout the site. A water bottle was observed near one of the holes and a cigarette butt was also discovered in the site.

28.     On April 16, 2019, your Affiant reviewed the recordings and photographs collected from the TIE that was deployed on the trail. The video recordings and photographs documented the following activity on the trail: On April 4, 2019 at approximately 1813 hours, two white males were observed entering the trail leading to the archeological site. One of the males wore a dark grey tee-shirt, jeans, a black belt, and brown hiking boots and was observed carrying a piece of flattened piece of cardboard and a white container. This male appears to be M3 who was documented digging in the site on March 22, 2019. The other male was wearing a forest green tee-shirt, blue jeans, hiking boots, and camouflage ball cap and had a cast on his left arm supported by a black sling secured around his neck. He is observed holding a white container. This individual appears to be M4 who was documented in the site on March 22, 2019. Both men are observed walking on the trail into the site. On April 4, 2019 at approximately 1916 hours, M3 and M4 are observed leaving the site via the trail. M3 is observed carrying the white container which appears to have dirt in it in his right hand and the cardboard in his left. He is also wearing a camouflage ball cap.

29.     On April 16, 2019, your Affiant reviewed the recording and photographs collected from the TIE that was deployed in the site. The video recordings and photographs documented on April 4, 2019 at approximately 1901 hours, show M4 with dirt on the knee area

14

of his jeans and holding a hammer in his right hand scraping the ground. He can be observed bending over and picking up an object off the ground and placing it in his right jean pocket. An orange emblem is observed on the front of his ball cap and a picture containing white and various colored graphics is observed on the front of his tee-shirt.

30.     On April 16, 2019, your Affiant reviewed the photographs collected from the TIE which was deployed on the road leading into the site. The video recordings and photographs documented on April 4, 2019 at approximately 1816 hours, an older Ford Explorer bearing Arkansas license plate 689XTM is observed on the road leading into the site area. On April 4, 2019 at approximately 1926 hours, the same Ford Explorer is observed leaving the area on the same road. M3 is the driver and M4 is the passenger in the vehicle.

31.     On April 17, 2019, your Affiant sent the video recordings of suspects M3 and M4 to Carnahan in an attempt to identify the individuals. Carnahan reviewed the recordings and identified M3 as THURMAN CHEESEMAN Jr. with a date of birth in 1977 and social security number xxx-xx-8878. Carnahan informed your Affiant that THURMAN CHEESEMAN Jr. is WADE CHEESEMAN'S brother and a convicted felon.

32.     On April 17, 2019, Special Agent, Criminal Investigator, Morgan Amos assigned to the Ozark – St. Francis National Forest assisted your Affiant with identifying F1. SA Amos conducted a search on Facebook, JusticeXchange, and LexisNexis. Through these searches conducted by SA Amos, information was found for a R. K. H. with a date of birth in 1991 and social security number xxx-xx-5015. Your Affiant showed R. K. H.'s photograph to Arkansas Game and Fish Commission Wildlife Officer Mac Davis who confirmed R. K. H. was F1 who was observed illegally digging in the archeological site.

33.     On April 19, 2019, Davis identified M4 as T. P. C. with a date of birth in 2003, and who is the son of THURMAN CHEESEMAN Jr.

34.     On April 22, 2019, your Affiant verified THURMAN CHEESEMAN Jr. resides at 6100 Persimmon Hill Road in Booneville, AR 72927, according to information provided from AGFC officers who arrested him earlier in the day for being a felon in possession of a firearm. Upon his arrest, THURMAN CHEESEMAN Jr. provided AGFC officers and the Scott County Detention Center Jailers with his current address of 6100 Persimmon Hill Road, Booneville, Arkansas 72927. THURMAN CHEESEMAN Jr.'s current address was also listed in the law enforcement database, JusticeXchange, as 6100 Persimmon Hill Road Booneville, Arkansas 72927. Your Affiant contacted U.S. Postal Inspector David L. Barrett, who verified the last name associated with 6100 Persimmon Hill Road, Booneville, Arkansas was CHEESEMAN.

35.     On April 22, 2019, your Affiant verified GARY JUSTICE, who is believed to be M2, and WADE CHEESEMAN, who is believed to be M1, are both living at 6108 Persimmon Hill Road, Booneville Arkansas 72927. Your Affiant received information from Davis who issued JUSTICE a violation notice and arrested WADE CHEESEMAN on April 15, 2019. During this contact, GARY JUSTICE and WADE CHEESEMAN provided an address of 6108 Persimmon Hill Road, Booneville Arkansas 72927 to AGFC officers and the Scott County Detention Jailers. Your Affiant checked with Arkansas Valley Electric who confirmed the utilities for this residence were in GARY JUSTICE'S name. Your Affiant contacted U.S. Postal Inspector David L. Barrett, who verified the name associated with 6108 Persimmon Hill Road, Booneville, Arkansas was WADE CHEESEMAN. Based on your Affiant's training and experience, it is common practice that looters tend to keep/retain artifacts in their homes to be put on display or retain as part of their personal collections. Looters are also known to sell and

16

trade such items for monetary purposes. Therefore, your Affiant believes the search of the residence will reveal violations of Title 16, United States Code, Section 470ee(a).

36.     The search will be executed with the assistance of Forest Service Archaeologist Roger Coleman who will be on site with his search team in order to identify archaeological artifacts.

37.     In conclusion, based upon the information contained in this Affidavit, your Affiant has probable cause to believe the residence and vehicles referenced in Exhibit "A," contain evidence of illegally obtained artifacts,  as well as journals and/or log books containing information and records about the Hicks Archeological site and retrieved artifacts, screens, fan shroud, picks, hammers, flat-point shovel, other hand tools (all of which constitute the fruits and instruments of criminal violations); one purple Crown Royal bag that may be empty or contain artifacts; and clothing, hats and footwear that were worn by THURMAN CHEESEMAN Jr. during the commission of illegal digging and excavating at the Hicks Archaeological Site.

38.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when.  Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. There is probable cause to believe that this forensic electronic evidence might be on the device because:

17

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file.

b.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a cellular telephone is evidence may depend on other information stored on the cellular telephone and the application of knowledge about how a cellular telephone behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.    How the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

18

WHEREFORE, Your Affiant prays that a search warrant be issued to allow the search of the residence, outbuilding, curtilage, and vehicles described in Exhibit "A" for the seizure of items enumerated in Exhibit "B," constituting evidence in a criminal case.

Respectfully submitted,

Mia T. Prince, Special Agent
United States Forest Service

Subscribed and sworn to before me on April __25__, 2019

Honorable Mark E. Ford
United States Magistrate Judge

19

**EXHIBIT "A" Search Warrant:**
**6100 Persimmon Hill Road Booneville, AR 72927**

1. <u>**6100 Persimmon Hill Road Booneville, Arkansas 72927:**</u>
   **Domicile:**

   A 39 acre parcel of land located at 35 00' 40" N -94 09' 43" W (Scott County AR) and

upon which is situated a single-wide mobile home 14' X 56' in dimension on cinder blocks.  The

mobile home is white in color with a flat metal roof with the front door facing west toward

another residence located at 6108 Persimmon Hill Road.  The front of the home has four

windows (an air condition unit in one of the front windows), one window on the right side, and

wooden stairs leading to the front door.



20

This mobile home is accessed from the rest area located on US 71 and the intersection of state highway 23 go south on US 71 from the rest area .6 of a mile to state highway 378. Turn right onto state highway 378 and travel 1.9 miles and turn onto Freedom Road. Turn left on Freedom Road for approximately 1.1 mile to Persimmon Hill Road. Approximately 1.2 miles on Persimmon Hill Road the driveways to the residence located at 6108 Persimmon Hill Road and mobile home located at 6100 Persimmon Hill Road is located. There are two mailboxes on the south side of the road with one black box containing the numbers 6108 and a white box without numbers.

2. **6100 Persimmon Hill Road Booneville, Arkansas 72927:**
   **Vehicle(s):**

   A. There are numerous unoccupied/inoperable vehicles located throughout the area.

   B. Thurman CHEESEMAN JR was last observed operating a Red Ford SUV containing AR license plate 689XTM registered to a Don HORN from Scott County, AR

21

## EXHIBIT "B" Search Warrant:
## 6100 Persimmon Hill Road Booneville, Arkansas 72927

1.      Any cameras capable of capturing still or video photographic images and all removable media storage devices, discs, or media cards contained therein, capable of storing or transferring the captured still or video photographic images;

2.      Any cell phone capable of capturing still or video photographic images and all removable media storage devices, or cards contained therein, capable of storing or transferring the captured still or video photographic image, and/or capable of connecting to the internet to disseminate such photos or facilitate use of an Instagram and/or Facebook account;

3.      Any ledgers, logs, books, lists, photos, compilations, receipts and financial records reflecting the valuation of, advertised price of, and/or purchased price of artifacts, sales transactions, or mail receipts reflecting the shipment of artifacts by US Postal Service, or any commercial carrier;

4.      Any ledgers, lists, photos, compilations, or records of customers who have purchased, or requested artifacts; and any pick, square-point shovel, fan shroud, and/or wooden-framed screens resembling those items previously observed and photographed in site 3SC0132.

5.      Any maps, commercially or personally produced, depicting the Ouachita National Forest or other public or Indian lands, bearing markings, writing, or other graphic annotations that indicate caves, bluff shelters, and/or archaeological, pre-historic or historic sites, or other information related to locating and retrieving artifacts on, or within the proclamation boundary of the Ouachita National Forest, public lands or Indian lands;

6.      Any computer(s), whether capable of internet connectivity or not, and capable of storing, receiving or transferring photographic images, and non-image data, or computer(s) used

22

to support and maintain the suspect's Instagram and/or Facebook accounts displaying artifact hunting and related comments, and all removable media storage devices contained in, on, or attached to said computer(s), and any media storage devices, discs, or media cards labeled as such relating to the hunting, collecting, or selling of artifacts.

7.     Any pre-historic or historic artifact, whether composed of stone, bone, fiber, wood, animal shell, tooth, clay or ceramic composite, or any other material, bearing evidence of ancient human alteration and manufacture indicative of items utilized by historic cultures (in excess of 100 years) or ancient peoples and cultures.

8.     Any clothing that can be identified by officers as being worn by suspects during illegal excavating activities in the site.

9.     Firearms, bullets, shell casings, bullet fragments, and all other firearm components.

The inclusion of cameras, computers, cell phones, and related electronic media storage devices among items to be seized by nature of their design imply and require the additional search of their internal contents after seizure of such devices to obtain relevant evidence.  This search requires forensic expertise and cannot be accomplished immediately upon seizure of such devices.

Therefore, your affiant requests that law enforcement officials or other forensic/technical specialist(s) working for law enforcement be authorized to execute this warrant and search any of the above referenced electronic devices seized pursuant to this warrant; and make an image copy of the electronic data stored on such device(s) at a place and time other than the initial execution of this search warrant upon the premises described in Exhibit "A."

This search is requested to include any seized electronic device's data processing hardware and the internal storage devices and any other devices, mechanisms or parts of such devices that are capable of collecting, displaying, converting, storing or concealing electronic data, to include images.

Particularly, the data and images sought in the search of such devices include photos of the Hicks site and other archaeological sites, activity at these sites, photos of any artifacts and the accompanying metadata of all such photos; any stored text messages referencing the location, collection and/or retrieval of artifacts and/or the selling of any artifacts; any electronic maps depicting the Ouachita National Forest or other geo-location records depicting the Ouachita National Forest; and data pertaining to the offering for sale any artifacts, and/or any word documents or files referencing the location, collection, and/or retrieval of artifacts.

Your Affiant is aware that the recovery of data by a computer forensic analyst takes significant time, and much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory of forensically obtained data from the aforementioned devices will necessarily be delayed until reasonably made available by the requested means.